# 08-MC-0031

Thomas M. Melton (4999)
Karen L. Martinez (7914)
William B. McKean (4883)
Attorneys for Plaintiff
Securities & Exchange Commission
15 West South Temple, Suite 1800
Salt Lake City, Utah 84101
Tel. 801-524-5796

FILED
U.S. DISTRICT COURT

2008 FEB -6 A 10: 56

DISTRICT OF UTAH

BY:_____
    DEPUTY CLERK

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

MAY - 9 2008

GREGORY C. LANGHAM
CLERK

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>PLAINTIFF,<br><br>v.<br><br>VESCOR CAPITAL CORP., a Nevada corporation, VESCOR CAPITAL, INC., a Nevada corporation, VESCORP CAPITAL, LLC, a Nevada limited liability company, VESCORP CAPITAL IV-A, LLC, a Nevada limited liability company, VESCORP CAPITAL IV-M, LLC, a Nevada limited liability company, a Nevada limited liability company, and VAL E. SOUTHWICK,<br><br>DEFENDANTS. | **COMPLAINT**<br><br>Case: 1:08cv00012<br>Assigned To : Benson, Dee<br>Assign. Date : 2/6/2008<br>Description: Securities and Exchange Commission v. Vescor Capital et al<br><br>Judge |

Plaintiff, Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants alleges as follows:

## INTRODUCTION

1.     This matter involves the fraudulent offer and sale of unregistered securities by Val E. Southwick ("Southwick") through several companies (collectively referred to as the "VesCor Companies"). The offering took place primarily through the sale of unregistered notes claiming to pay returns of between 8% and 24% per year, ostensibly to finance several real estate developments.

2. The VesCor Companies were headquartered in Ogden, Utah and offered and sold securities directly to investors, as well as through registered representatives associated with a now-defunct registered broker-dealer.

3. In total, Southwick formed and/or utilized approximately 150 corporations and limited liability companies (collectively referred to as "VesCor," or the "VesCor enterprise") to raise money from investors and develop and manage real estate projects. The money raised from investors were often used to repay earlier VesCor investors, pay Southwick's and his family's living expenses and fund expenses associated with any of the real estate developments and operations of the VesCor enterprise.

4. Southwick and the VesCor Companies have raised at least $180 million through the fraudulent sales of securities to investors primarily located in the western United States, including many Utah residents.

5. Southwick told investors that he was planning to develop large real estate projects and that their investments would be secured by interests in those projects. Southwick represented that VesCor's real estate developments were profitable and assured prospective investors that each project's encumbrances would be limited to protect investors' secured interests.

6. Instead, Southwick operated a massive Ponzi scheme, paying existing noteholders with funds from new investors. Payments to almost all VesCor noteholders stopped in or about May 2006.

7. Virtually all of the VesCor real estate developments were unprofitable.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction by authority of Sections 20 and 22 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77t and 77v] and Sections 21 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u and 78aa].

9. Defendants, directly and indirectly, singly and in concert, have made use of the means and instrumentalities of interstate commerce and the mails in connection with the transactions, acts and courses of business alleged herein, certain of which have occurred within the District of Utah.

10. Venue for this action is proper in the District of Utah under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the transactions, acts, practices, and courses of business alleged in this Complaint took place in this district and because certain of the defendants reside in and transact business in this district.

11. Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and course of business alleged herein and in transactions, acts, practices, and courses of business of similar purport and object.

12. Defendants' conduct took place in connection with the offer, purchase and/or sale of securities, primarily in the form of Promissory Notes.

## DEFENDANTS

13. **VesCor Capital Corporation ("VCC"),** headquartered in Ogden, Utah, is a Nevada corporation formed by Southwick in 1990. VCC was one of the main entities Southwick used to carry out his scheme. Although prohibited from the fraudulent sale of unregistered securities in Utah by the Utah Division of Securities in 2002, Southwick and VCC continued to sell unregistered securities and continued to make misrepresentations to investors during and after 2002. In 2004, Southwick and VCC entered into a second agreement

prepared. Southwick and VCC did not fulfill the terms of the second agreement.

14. **VesCor Capital, Inc. ("VCI"),** headquartered in Ogden, Utah, is a Nevada corporation formed by Southwick in 1995. VCI was one of the primary issuers of the unregistered promissory notes. VCI filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court, District of Utah on May 30, 2007.

15. **Vescorp Capital, LLC ("Vescorp"),** headquartered in Ogden, Utah, is a Nevada limited liability company formed by Southwick in 2003. Vescorp purported to issue promissory notes pursuant to Rule 506 of Regulation D (17 C.F.R. § 230.506).

16. **VesCorp Capital IV-A, LLC, ("VesCorp IV-A")** headquartered in Ogden, Utah, is a Nevada limited liability company formed by Southwick in 2004. Vescorp Capital IV-A purported to issue promissory notes pursuant to Rule 506 of Regulation D (17 C.F.R. § 230.506).

17. **VesCorp Capital IV-M, LLC, ("VesCorp IV-M")** headquartered in Ogden, Utah, is a Nevada limited liability company formed by Southwick in 2004. Vescorp Capital IV-A purported to issue promissory notes pursuant to Rule 506 of Regulation D (17 C.F.R. § 230.506).

18. **Val E. Southwick ("Southwick")** is a resident of Ogden, Utah. Southwick founded, controlled and is responsible for the operations, activities, accounts and uses of funds of the VesCor enterprise.

## BACKGROUND

19. Southwick and the Vescor Companies have sold at least $180 million in unregistered notes to over 800 investors since approximately 1990. Southwick, the VesCor Companies and the VesCor enterprise were purportedly in the business of real estate development.

4

20. VCC, VCI, Vescorp, VesCorp IV-A and VesCorp IV-M were the primary entities that Southwick used to issue securities in the form of promissory notes.

21. Throughout the past 17 years, Southwick's operations have involved a practice whereby Southwick caused the VesCor Companies to issue promissory notes and other securities to finance several real estate projects he developed and proposed to develop. However, rather than using investor funds to develop specific real estate projects as represented, Southwick often used investor funds to meet various obligations, including applying a significant amount of money to pay VesCor Companies' promised returns to earlier investors.

22. While Southwick was carrying out the fraudulent scheme, the VesCor Companies' obligations to noteholders grew considerably, while the real estate projects of the VesCor enterprise proved unprofitable. During the scheme, Southwick kept the VesCor enterprise viable by convincing many noteholders to roll over their investments in the VesCor Companies and by initiating new real estate projects for which Southwick raised funds that were then used to finance his current obligations to other investors and pay for the ongoing expenses of the VesCor enterprise.

23. Through the VesCor enterprise, Southwick developed, or initiated the development of, several real estate projects in the western states including office buildings, a storage facility, apartment complexes, condominium projects, and a planned luxury hotel and industrial park.

24. The locations of these projects include California, Montana, Nevada and Utah.

25. Southwick's sales pitch to prospective investors in all of the VesCor projects was that he was seeking funding to develop a specific piece of property, or several real estate projects, through the issuance of notes to investors. In

general, Southwick stated that the funds raised by the issuer of the VesCor notes or other securities would be loaned to a developer, which was often a VesCor-related entity. In return, investors generally received a promissory note of a stated term and interest rate, and a purported secured interest in the related property.

26. For each of the developments, Southwick formed a complex network of companies to perform various functions or provide services to the projects. For example, in VesCor's last purported development, a planned industrial park near Las Vegas, Southwick created and/or utilized dozens of companies to perform functions of land acquisition, property and investment holdings, financing entities, and a variety of other activities.

27. Investments related to the Las Vegas industrial park project were sold from at least 2004 through 2006.

28. The industrial park was never developed beyond the legal subdivision of the land and raising of investor funds.

29. Some investors in VesCor projects received recorded secured interests, such as trust deeds, while other investors were told they would receive such interests but never did. Other investors were actually given documents that appeared to represent secured interests, but the interests were never recorded.

## RECRUITING INVESTORS

30. The VesCor securities were offered to investors in various ways. The Vescor Companies and Southwick offered and sold the promissory notes and other securities through the means and instrumentalities of interstate commerce.

31. Southwick solicited many investors directly.

32. Other investors were solicited by their friends or family members, many of whom had also invested in VesCor.

6

33. Southwick retained and supervised the activities of the unlicensed sales representatives in several states who were paid commissions on the sale of notes and other securities by the VesCor Companies. The role and function of the unlicensed salespersons was to solicit investors to purchase the notes, and Southwick was often involved in those solicitations through communicating with potential purchasers, making presentations to them and sometimes closing the sales.

## VESCOR'S SALE OF PROMISSORY NOTES

34. The primary instrument used by VesCor to raise investor funds was promissory notes. Those notes generally had terms of 24-60 months with stated interest rates of between 8% and 24% a year. Investors in the notes were given the option of taking monthly interest payments on the notes or accruing the interest until the notes expired and receiving a lump sum payment.

35. Investors who chose to accrue their monthly interest payments received a higher stated interest rate on their notes than those who opted for monthly payments.

36. As Vescor funds became limited, investors were encouraged to roll over their investments in VesCor when the term of their notes expired in exchange for promises of higher interest rates or other incentives.

37. Many noteholders were told they would be provided a secured interest in the underlying real property, usually in the form of a trust deed. Some investors did receive recorded, perfected claims on properties, others were promised such secured claims but failed to receive them, and others were given claims that were represented to be secured and perfected but in fact were not.

38. At least five VesCor Companies issued notes to investors. Four of those companies filed notices of exemptions with the Commission, provided Private

Placement Memoranda to investors with respect to at least some of the notes issued by those companies. The fifth entity did not make a Form D filing with the Commission.

39. The promissory notes sold by the Vescor Companies and Southwick were offered to investors with the promise that the investors would profit from their investment in the promissory notes. Investors believed that their returns would be generated by profits from the real estate developments.

40. The promissory notes were offered and sold to a broad segment of the public; while over 800 individuals invested, far more prospective investors were contacted.

41. Vescor records reflect that at least $180 million was invested by individual investors.

42. A number of the investors were elderly, unsophisticated investors who invested retirement savings and/or borrowed against their homes to invest in VesCor notes.

43. The vast majority of investors have not received interest payments since May 2006. Consequently, many of the elderly investors have encountered serious financial difficulties as a result.

44. None of the securities offered and sold by Southwick and the VesCor Companies were registered with the Commission, and no exemption from registration was available.

## MISREPRESENTATIONS TO INVESTORS

45. Southwick, his agents and the VesCor Companies made a number of representations to investors in order to induce them to invest. These representations included:

   A. Investors were told that their money would be used to fund either a specific real estate project or a group of projects.

8

B. Investors were told that VesCor and/or certain VesCor-related companies were highly successful companies that had been actively developing, leasing or selling several real estate properties for several years or decades and that the properties VesCor had developed were very profitable and generated significant cash flow.

C. Documents related to the real estate projects provided investors specific information about each project, including its purported valuation and plans related to the management, leasing or ultimate disposition of the property.

D. Investors were told that the properties VesCor had developed were purchased at a lower valuation, had been improved by VesCor and were sold at higher values, generating profits on the investment.

E. Many investors were told the risk to their investment was nonexistent or extremely limited because their investments were protected and secured by a real property interest, often a trust deed in first position on the underlying property, and that investors would not take junior lien positions.

F. Other investors were told their investments were collateralized by an asset that significantly exceeded the amount of the investment, including a certificate of deposit, money market account or similar asset owned by a VesCor-related company.

G. Investors often were told their investments were safe because investor money would be loaned on the property being financed at a loan-to-value ratio of only 60% to 70% of the stated value of the property, thereby maintaining sufficient equity in the project to cover the secured position of the investors.

H. Some investors were told their principal would be collateralized by the assets of the Vescor Companies. Investors were told that the collateral would be valued at over 200% of the investment amount.

46. These representations were false and misleading. For example, rather than using investor money to develop specific real estate projects, Southwick often used investor money as he pleased, such as making payments to other investors, meeting the expenses of any of the VesCor entities whether or not it was related to the investment project at hand, and for his personal use.

47. During the final days of VesCor's operations, no real estate development was taking place; however, Southwick continued to solicit investor money under that guise.

48. Southwick's representations regarding the security of the VesCor investments were also false. Certain investors were told their investments would be secured by recorded trust deeds, other investors were told their investments would be collateralized by VesCor assets, and some investors were told that VesCor developments all had ample equity to cover investors' funds. In fact, trust deeds, if issued at all, were often not recorded or were later released from recordation, unbeknownst to the investors. In many instances, the collateral touted by Southwick as security against investor funds did not exist. Finally, the real estate developments were all encumbered well in excess of their values and had no equity to cover investor funds.

49. Southwick also told investors VesCor was a successful enterprise, that his real estate projects were highly profitable and provided more than enough cash flow to meet company obligations. In fact, virtually all the real estate projects were unprofitable and failed to provide sufficient cash flow to meet expenses and obligations to investors. Moreover, the VesCor enterprise was insolvent

as early as 2003; however, Southwick continued to solicit investments under the claim that VesCor was a highly successful business until September 2006.

50.  Southwick also failed to provide material information to investors. He failed to disclose the actual use to which invested funds would be put and the precarious financial condition his companies were in at the time of his solicitations. He also failed to disclose to investors the Consent Order issued by the Utah Division of Securities in 2002 and an agreement he entered into with the Utah Division of Securities in 2004.

51.  Southwick knew, or was reckless in not knowing, that the representations were false and misleading. He was in control of all of the VesCor operations and activities and knew the representations that were made to investors. In fact, he made many, if not all, of the misrepresentations in personal solicitations to investors.

52.  Southwick knew, or was reckless in not knowing, that the Vescor operations and its real estate developments were not profitable and that investor funds were being used to pay returns to earlier investors.

53.  The last known VesCor investment was made well after Southwick had ceased developing real estate or making payments to investors. In August 2006, an investor contacted Southwick based on the recommendation of friends who had previously invested with VesCor. Rather than informing this investor that VesCor had ceased to develop property and was not able to repay investors, Southwick stated that VesCor was still raising funds to develop an industrial park near Las Vegas and that the investor's investment would be used to purchase, improve and sell real property related to the industrial park.

54.  This investor told Southwick he intended to invest his entire pension in VesCor and that the most important factor in the investor's decision to invest

was the safety of his principal. Southwick told the investor that the investment was "absolutely safe."

55. Southwick further told the investor that VesCor was doing well and had been in business for over 30 years.

56. Southwick also stated that the investment would be collateralized by assets of the company and that the investor's principal would be returned in the event of a "fire sale." Southwick also stated the investor's name would be listed on the title to the property.

57. The investor placed his entire pension of more than $300,000 with Southwick in September 2006. The investor's money was not used to purchase real estate, and the investor never received title to any land. Instead, Southwick simply misappropriated the funds to meet his and VesCor's obligations.

58. The misrepresentations and omissions made by Southwick and the Vescor Companies were material.

## FIRST CAUSE OF ACTION
### EMPLOYMENT OF A DEVICE, SCHEME OR ARTIFICE TO DEFRAUD
### Violation of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]

59. The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 though 58, above.

60. Defendants, and each of them, by engaging in conduct described in Paragraphs 1 though 58, above, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, with scienter, employed devices, schemes, or artifices to defraud.

61. By reason of the foregoing, Defendants, and each of them, directly or indirectly, violated, and unless restrained and enjoined by this Court, will

continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## SECOND CAUSE OF ACTION
### FRAUD IN THE OFFER AND SALE OF SECURITIES
### Violations of Section 17(a)(2) and (3) of the Securities Act
### [15 U.S.C. § 77q(a)(2) and (3)]

62.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 though 58, above.

63.     Defendants, and each of them, by engaging in the conduct described in Paragraphs 1 through 58, above, directly and indirectly, in the offer and sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

64.     By reason of the foregoing, Defendants, and each of them, directly or indirectly, violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## THIRD CAUSE OF ACTION
### FRAUD IN CONNECTION WITH THE PURCHASE AND
### SALE OF SECURITIES
### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5
### thereunder [17 C.F.R. § 240.10b-5]

65.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 though 58, above.

66. Defendants, and each of them, by engaging in the conduct described in Paragraphs 1 through 57, above, directly or indirectly, by the use of means or instrumentalities of interstate commerce or use of the mails, in connection with the purchase or sale of securities, with scienter, (1) employed devices, schemes, or artifices to defraud; (2) made untrue statements of material fact or omitted to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or (3) engaged in acts, practices, or courses of business that operated or would operate as a fraud and deceit upon other persons.

67. By reason of the foregoing, Defendants, and each of them, violated, and unless restrained and enjoined will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## FOURTH CAUSE OF ACTION
## OFFER AND SALE OF UNREGISTERED SECURITIES
### Violation of Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)]

68. The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 though 58, above.

69. Defendants, and each of them, by engaging in the conduct described in paragraphs 1 through 58, above, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or the mails, offered to sell or sold Vescor Companies securities or, directly or indirectly, carried such securities through the mails or in interstate commerce, for the purpose of sale or delivery after sale.

70. No registration statement has been filed with the Commission or has been in effect with respect to these securities.

14

71. By reason of the foregoing, the defendants, directly or indirectly, violated, and unless enjoined will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

### FIFTH CAUSE OF ACTION
### OFFER AND SALE OF SECURITIES BY AN
### UNREGISTERED BROKER OR DEALER
### Violation of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]

72. The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 though 58, above.

73. Defendant Southwick, directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase and sale of, securities in Vescor Companies without being registered as a broker or dealer with the Commission or associated with a broker or dealer registered with the Commission.

74. By reason of the foregoing, Defendant Southwick violated, and unless restrained and enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. 78o(a)].

### RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that the Defendants committed the violations charged herein.

### II.

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that permanently enjoin, Defendants, and their officers agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service

15

or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Sections 5(a), 5(c) and 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## III.

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that permanently enjoin, Defendant Southwick and his officers agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 15(a) of the Exchange Act

## IV.

Enter an order directing Defendants, and each of them, to pay civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.

## V.

Enter an order directing Defendants to disgorge all ill-gotten gains received during the period of violative conduct and pay prejudgment interest on such ill-gotten gains.

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

Dated this 6th day of February 2008.

Respectfully submitted,

Thomas M. Melton
Karen L. Martinez
William B. McKean
Attorneys for Plaintiff
Securities and Exchange Commission

Thomas M. Melton (4999)
Karen L. Martinez (7914)
William B. McKean (4883)
Attorneys for Plaintiff
Securities & Exchange Commission
15 West South Temple, Suite 1800
Salt Lake City, Utah 84101
Tel. 801-524-5796

FILED
U.S. DISTRICT COURT

2008 MAY -5  A 10: 56

DISTRICT OF UTAH

BY:_____
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

---

SECURITIES AND EXCHANGE COMMISSION,

PLAINTIFF,

v.

VESCOR CAPITAL CORP., a Nevada corporation,
VESCOR CAPITAL, INC., a Nevada corporation,
VESCORP CAPITAL, LLC, a Nevada limited liability
company, VESCORP CAPITAL IV-A, LLC, a Nevada
limited liability company, VESCORP CAPITAL IV-M,
LLC, a Nevada limited liability company, a Nevada limited
liability company, and VAL E. SOUTHWICK,

DEFENDANTS.

(proposed) ORDER
APPOINTING A RECEIVER

Civil No. 1:08cv00012

Judge Dee Benson

---

WHEREAS this matter came before the Court upon motion of the Plaintiff

Securities and Exchange Commission ("Commission") to appoint a receiver for the

purpose of marshalling and preserving assets in the above-captioned action; and

WHEREAS the Court has indicated that the appointment of a Receiver in this

action is necessary and appropriate; and

WHEREAS certain assets are in danger of having their value reduced by the

passage of time, and it is appropriate that the assets be marshaled and an accounting

provided to the Court; and

WHEREAS, this Court has jurisdiction over the subject matter of this action and Defendants, and venue properly lies in this district.

**NOW THEREFORE:**

**I.**

**IT IS HEREBY ORDERED** that, pending the determination of the Commission's action on the merits, or such other time as the Court may order, Robert G. Wing of Prince Yeates & Geldzahler be appointed Receiver ("the Receiver") of the Defendants Vescor Capital, Corp., Vescor Capital, Inc., Vescorp Capital, LLC, Vescorp Capital IV-A, LLC and all affiliated limited partnerships, corporations or other business entities (collectively, the "Companies"). The Receiver shall take control of the Companies' funds, assets and property wherever situated, with the powers set forth herein, including powers over all funds, assets, premises (whether owned, leased, occupied, or otherwise controlled), choses in action, books, records, and other property belonging to or in the possession of or control of the Companies, and the Receiver is hereby authorized, empowered, and directed:

      a.    to have access to, to marshal and take control of all funds, assets, premises (whether owned, leased, occupied or otherwise controlled), choses in action, papers, books, records in whatever media, and other property, wherever located, belonging to, in the custody, control or possession of the Companies, with full power to take such steps as he deems necessary to secure such premises, funds and property;

      b.    to have control of, and to close, transfer or otherwise take possession of all accounts, securities, funds, or other assets of, or in the name of the Companies at any bank, brokerage firm or financial institution which has possession, custody or control of any assets or funds of the Companies, or of any assets deposited by customers or clients with the Companies, or into an account in the name of the Companies, or held in trust or deposited with the Companies or its agents or trustees, wherever situated;

2

c.    to take such action as is necessary and appropriate to preserve and take control of, and to prevent the dissipation, concealment, or disposition of any assets in the possession, custody, name, or control of the Companies;

d.    to hold in his possession, custody and control all assets, securities, monies and property, together with all profits, dividends, interest or other income attributable thereto, of whatever kind deposited by the Companies, with the Companies, or into an account in the name of the Companies, pending further order of this Court;

e.    to make or authorize such payments and disbursements from the funds and assets under his control pursuant to this Order, and to incur, or authorize the incurrence of, such expenses and make, or authorize the making of, such agreements as may be reasonable, necessary and advisable in discharging his duties as Receiver;

f.    to engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers.

g.    to take possession, have access to, and to review all mail or any other communication, in any form, of the Companies or of its agents, officers and directors;

h.    to take any action which he deems to be necessary and appropriate in order to cause the Companies to file a bankruptcy petition under any chapter of Title 11 of the United States Code, including the execution of all necessary corporate resolutions or directions. The Defendants or any other person affiliated with the Companies or purporting to act on behalf of the Companies may not file a bankruptcy petition under any chapter of Title 11 of the United States Code on behalf of the Companies or under any analogous law of any other jurisdiction. In the event that a Bankruptcy petition is filed on behalf of the Companies, the bankruptcy reference shall be withdrawn with regard to payment of fees and expenses of the Receiver, his attorneys, accountants, consultants and any other person or entity hired to assist the Receiver in the execution of

3

his duties pursuant to this Order, and this Court shall retain jurisdiction over the payment of such fees and expenses;

i.     to make demand, file or otherwise handle any claim under any insurance policy held by or issued on behalf of the Companies, its officers, directors, agents, employees, trustees or other persons affiliated with the Companies and to take any and all appropriate steps in connection with such policies.

## II.

**IT IS HEREBY FURTHER ORDERED** that, in connection with the appointment of the Receiver provided for above:

a.     The Companies and all officers, agents, servants, employees, attorneys-in-fact, shareholders, consultants, accountants, advisers, counsel and other persons, and Defendants in this action, who are in custody, possession, or control of any customer or client information, assets, books, records, or other property belonging to or in the custody or control of the Companies shall forthwith give access to and control of such property to the Receiver, and shall forthwith grant to the Receiver, or such other person whom the Receiver may designate, authorization to be the signatory as to all accounts at banks, brokerage firms or financial institutions which have possession, custody or control of any assets or funds in the name of or for the benefit of the Companies.

b.     The Receiver is authorized, empowered, and directed without further leave of the Court, to liquidate and convert into money all of the assets, property, estate, effects and interests of every nature held in his possession and control pursuant to this Order, by selling, conveying, and disposing of the property, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the persons or parties entitled to the proceeds, and with due regard to the realization of their true and proper value and to deposit such proceeds into an account, pending further order of the Court.

    c.      The Receiver is authorized to invest any and all money or proceeds in his possession and control in United States Treasury instruments or in a money market account that invests solely in United States Treasury instruments.

    d.      All banks, brokerage firms, financial institutions, and other business entities which have possession, custody or control of any assets, funds or accounts in the name of or for the benefit of the Companies shall cooperate expeditiously in the transfer of funds, other assets and accounts to the Receiver or at the direction of the Receiver.

    e.      All banks, brokers, dealers, depositories or any other financial institutions shall not liquidate, transfer, sell, convey or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Companies except upon instructions from the Receiver or his designees.

    f.      The Receiver shall have the authority to issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure. .

    g.      Defendants and their respective officers, agents, servants, employees, and attorneys-in-fact, consultants, accountants, advisers and counsel shall cooperate with and assist the Receiver, including, if deemed necessary by the Receiver, by appearing for deposition testimony and producing documents, and shall take no action, directly or indirectly, to hinder, obstruct, or otherwise interfere with the Receiver in the conduct of his duties or to interfere in any manner, directly or indirectly, with the custody, possession, management, or control by the Receiver of the funds, assets, premises, and choses in action described above.

    h.      The costs, fees and expenses of the Receiver incurred in connection with the performance of his duties described herein, including the costs and expenses of those persons who may be engaged or employed by the Receiver to assist him in carrying out his duties and obligations hereunder shall be paid out of the proceeds or other assets of the Companies, or any and all assets under the control of the Receiver pursuant to this Order. All applications for costs, fees and expenses for services rendered in connection

with the Receiver shall be made by application setting forth in reasonable detail the nature of the services and shall be heard by the Court. The court-appointed receiver shall submit his fee application to counsel for the Commission for review at least ten (10) days prior to filing the application with the Court.

i.    No bond shall be required in connection with the appointment of the Receiver. The Receiver and all other persons who may be engaged or employed by the Receiver to assist him in carrying out his duties and obligations hereunder shall not be liable for any act or omission of the Receiver or such person, respectively, or any of their partners, employees, or agents, unless it shall be proven that the Receiver or such other person acted or omitted to act willfully and in bad faith. This provision shall apply to claims based on conduct of the Receiver and all other persons who may be engaged or employed by the Receiver hereunder during the term of the appointment by this Court, even if such claims are filed after the termination of any such appointment.

### III.

IT IS HEREBY FURTHER ORDERED that, pending the determination of the Commission's action on the merits, representatives of the Receiver are authorized to have continuing access to inspect or copy any or all of the corporate books and records and other documents of the Companies, including records relating to any accounts maintained by or in the name of the Companies at a broker, dealer, financial institution, depository institution or any other entity, or of accounts maintained on behalf of the Companies' customers or clients that have transferred, transmitted or otherwise delivered any securities, monies, or property of any kind, to the Companies, and continuing access to inspect the Companies funds, property and assets, including customer or client accounts, wherever they may be located.

### IV.

IT IS HEREBY FURTHER ORDERED that, in addition to the powers, duties and responsibilities as set forth herein, the Receiver shall be authorized, empowered and

directed to investigate, prosecute, defend, intervene in or otherwise participate in, compromise, and adjust actions in any state, federal or foreign court or proceeding of any kind as may in his sole discretion be advisable or proper to recover or conserve funds, assets and property of the Companies.

### V.

**IT IS HEREBY FURTHER ORDERED** that the Companies and its officers, directors, employees, agents and counsel shall transfer to the Receiver, as and when directed by him, any and all funds, property, documents or records of the Companies, in whatever form, that may be in their possession, custody or control; and that any signatories on any and all the Companies' accounts at banks, brokerage firms or financial institutions which have possession, custody or control of any assets or funds in the name of or for the benefit of the Companies, shall forthwith take all steps necessary to relinquish their signatory authority as to said accounts including, but not limited to, accounts containing securities or other assets that the Companies' customers have transferred, transmitted or otherwise delivered to the Companies.

### VI.

The following acts are stayed pending further order of this Court:

(i)     the commencement or continuation, including the issuance or employment of process, of any judicial, administrative, or other action or proceeding, other than actions of the Commission related to the above-captioned enforcement action, against the Companies;

(ii)    the enforcement against the Companies against property now held in the name of or by the Companies, of any judgment obtained before the filing of the Complaint in this action;

(iii)   any act to obtain possession of property held by the Entities or Southwick or to exercise control over property held by the Entities or Southwick;

7

(iv)     any act to create, perfect or enforce any lien against property held by the Entities or Southwick;

(v)     any act to collect, assess or recover any claims related to the Companies, or against property held by the Companies; and,

(vi)     the exercise of any rights of setoff or recoupment.

### VI.

**IT IS FURTHER ORDERED** that this Order shall remain in effect and shall supplement all prior Orders of this Court until further Order of this Court. The Court shall retain jurisdiction of this matter for all purposes.

Dated this 5ᵗʰ day of May, 2008.

_____
UNITED STATES DISTRICT JUDGE

I hereby certify that the annexed is a true and correct copy of a document or an electronic docket entry on file at the United States District court for the District of Utah.

\# of pages 8

Date: 5-7-08

D. MARK JONES, Clerk

By: _____
Deputy Clerk

8